FILED
2:33 pm Sep 20 2019
Clerk U.S. District Court
Northern District of Ohio
Cleveland

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF ) | Case No. 1:19mj3261 |
| THE EXTRADITION OF ) | |
| David Lee Parker, ) | THOMAS M. PARKER |
| a/k/a Bryan Willis, a/k/a ) | U.S. MAGISTRATE JUDGE |
| Bryant Keith Willis, a/k/a ) | |
| Raoul Duke ) | |

COMPLAINT
(18 U.S.C. § 3184)

I, the undersigned Assistant United States Attorney, Om M. Kakani, being duly sworn, state on information and belief that the following is true and correct:

1. In this matter I act for and on behalf of the Government of the United Kingdom.

2. There is an Extradition Treaty in force between the United States and the United Kingdom, the Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003, U.S.-U.K., Dec. 16, 2004, S. TREATY DOC. NO. 109-14 (2006) ("the Treaty").

3. Pursuant to the Treaty, the Government of the United Kingdom has submitted a formal request through diplomatic channels for the extradition of David Lee Parker ("PARKER").

4. According to the information provided by the United Kingdom, PARKER was tried and convicted of the below listed crimes on November 23, 2007, after failing to appear

before the Southwark Crown Court:

    a)    Counts 1 and 2: Fraudulent Trading, in violation of Section 458 of the Companies Act of 1985;

    b)    Counts 3 and 4: Undischarged Bankrupt Acting in the Management of a Limited Company, in violation of Section 11 of the Company Directors Disqualification Act of 1986;

    c)    Count 5: Obtaining a Service by Deception, in violation of Section 1 of the Theft Act of 1978;

    d)    Count 6: Bankrupt Obtaining Credit while Discharged and Failing to Notify Creditor of Status, in violation of Section 360 of the Insolvency Act of 1986;

    e)    Counts 7, 9, and 10: Obtaining Property by Deception, in violation of Section 15 of the Theft Act of 1968; and

    f)    Count 8 - Evasion of a Liability by Deception, in violation of Section 2(1)(a) of the Theft Act of 1978.

    5.    PARKER was convicted of all counts and sentenced to a total term of four years of imprisonment. Under Article 12(2)(e) of the Treaty, a judgment of conviction against the person sought is sufficient to request the extradition of the person.

    6.    The conviction issued on the basis of the following facts:

    a)    PARKER was declared bankrupt on July 19, 2000, and, as a result, was prohibited from directly or indirectly taking part in the promotion, formation or management of companies without the leave of court and for a period of three years. PARKER was also prohibited from obtaining credit in excess of £250 without notifying potential creditors of his bankrupt status. On August 1, 2000, an examiner at the Official Receiver's office served PARKER with a notice giving him details of the obligations and prohibitions of a bankrupt, which included the aforementioned.

    b)    Despite these restrictions, PARKER continued to engage in the business of two companies, Hard Times Europe Ltd. ("Hard Times") and American Chili Concepts Ltd. ("American Chili"), without leave of court and for alleged fraudulent purposes. PARKER obtained credit and commercial opportunities by reason of his association with the companies, which would not have otherwise been extended had persons extending the credit or offering the opportunities known of PARKER's and the

companies' true position and status.  PARKER also made additional fraudulent statements, promises, and material omissions in furtherance of obtaining these credit and commercial opportunities.  As a result, PARKER was charged in **Counts 1 and 2** with fraudulent trading, contrary to Section 458 of the Companies Act 1985 and, in **Counts 3 and 4**, with being an undischarged bankrupt acting in the management of limited companies in violation of Sections 11(1) and 13 of the Company Directors Disqualification Act between September 1, 2001 and July 17, 2003, for Hard Times and June 1-July 17, 2003, for American Chili.

   c) For example, in one instance outlined in the extradition request, PARKER asked victim RF – whom he met at a gym in London – to be an investor in Hard Times.  According to testimony provided by RF in 2003, PARKER represented to RF that PARKER obtained a license to operate a chain of restaurants and bars in the UK and Europe under the franchise known as Hard Times, and provided paperwork that showed PARKER as the Managing Director of the company.  PARKER also falsely represented that victim BW was a director of Hard Times and that PARKER's London address was being used as the point of contact only because BW was based in the United States.  Not only did PARKER misrepresent to RF that BW was a director of Hard Times, but he also failed to disclose that PARKER was a bankrupt and prohibited from managing or promoting companies.  Despite declining to make an investment with Hard Times, RF agreed to lend the company £12,700, based on PARKER's representations and promises and provision of security.  As security, PARKER offered a Jeep valued at £11,905, along with registration documentation. PARKER agreed to repay the loan by March 14, 2003, and stated that RF would retain the Jeep. However, PARKER failed to repay the loan, and then informed RF that his money had been lost in a deal, and that PARKER did not actually own the Jeep that he had offered as security.

   d) In another instance, after PARKER had already been declared bankrupt and was prohibited from managing companies or obtaining credit without disclosing his status, PARKER solicited acquaintance and victim LE to invest in Hard Times. LE believed PARKER was the owner of the company, and PARKER offered him 30 shares of £10,000 each in the company allegedly to raise funds of £300,000 to purchase a property.  LE provided testimony stating that he declined to purchase shares at that time.  In late 2001, PARKER contacted LE claiming that he had sold 28 of his 30 shares at £10,000 each, which persuaded LE to invest in the remaining two shares.[1] By the end of 2003, LE had not received any return on the investment and asked PARKER to repay the money invested. LE met with PARKER in January 2004, when PARKER told him things had gone wrong and that money had been used to pay legal fees and deposits, as opposed to the purchase of property as represented. LE was not repaid.

---

[1] It is not clearly stated, but may be presumed, that PARKER did not disclose to Eckersley his bankruptcy status or the prohibitions placed upon him.

3

  e) PARKER's bankruptcy ended in 2003 but his conduct of obtaining cash and property from others by fraud continued. Records indicate that on April 19, 2002, victim and witness BW, a childhood friend of PARKER's who occasionally communicated with him, was "appointed" director of the company. However, as charged in **Count 5** (obtaining a service by deception in violation of Section 1 of the Theft Act 1978), PARKER used BW's name, without his knowledge or consent, to secure charges and credit services from American Express for American Chili. In these applications, PARKER gave details of BW's earning at American Chili. According to testimony provided by BW, BW never completed the applications, the representations were false, and he (BW) was never involved in the company American Chili. The address associated with the account was PARKER's. Payments were not made on the credit account, and the loss to American Express was approximately ₤47,000.

  f) The remainder of the counts of conviction relate to: (1) PARKER's fraudulent obtaining of credit in the amount of ₤12,500 from victim SS (**Count 6**), (2) the fraudulent purchase of a Porsche from PARKER's neighbor, SF (**Counts 7 and 8**), and (3) the fraudulent obtaining of two loans totaling ₤13,000 from the brother of a property owner engaged in a real estate transaction with PARKER (**Counts 9 and 10**).

  g) **Count 6** relates to PARKER's obtaining credit in the amount of ₤12,500 from victim SS while Parker was an undischarged bankrupt and failing to disclose his bankruptcy status to SS, in violation of Section 360 of the Insolvency Act 1986. According to a statement from SS: In or about January 2003, Parker asked SS, a property manager, to provide Parker a personal loan in the amount of ₤12,500 for a period of three-to-four days, purportedly to help Parker secure an exchange of contracts on a lease he had secured. Although SS initially declined, Parker was persistent and offered SS a 1 percent share in Hard Times Limited. Eventually, SS agreed to loan Parker the ₤12,500 for a period of four days, and on January 21, 2003, SS wired the amount to the bank account of Parker's wife Emily Kirkland. Parker failed to repay SS and then issued SS a series of checks, which were returned uncleared and unpaid. Four of the checks issued from a bank account "For and on behalf of Hard Times Europe Limited." Between December 1, 2003, and January 15, 2004, Parker made four repayments totaling ₤850. On April 2, 2003, Parker agreed to secure the ₤12,500 loan to "me and my company" with a second charge against his "home" at 19 Swinburne Road, London. SS subsequently discovered that Parker was subject to a Bankruptcy Order from the High Court. Parker had not informed SS of his bankruptcy. SS would not have loaned Parker money if Parker had disclosed the bankruptcy. SS received a further ₤8,000 in cash from Parker, with the remainder outstanding

  h) **Counts 7 and 8** relate to PARKER's fraudulent conduct relative to victim SF, PARKER's neighbor. According to testimony provided by SF, in October 2005, PARKER asked SF whether SF would sell his Porsche. SF agreed, and the two set a price. PARKER took possession of the car and gave SF a check for €27,000 that

bounced. When SF spoke to him about this, PARKER blamed the bank. SF wrote to PARKER demanding payment and warning legal action if he did not receive it. Five months later, PARKER wrote a check for $35,546.47 and sent it to SF; again, the check bounced, because the account from which it was drawn had been closed. SF then found out that PARKER had sold the Porsche to someone else. SF eventually pursued legal action against PARKER and was awarded £20,100.  PARKER was ultimately convicted in **Count 7** of obtaining property by deception in violation of Section 15 of the Theft Act 1968.  He was also convicted, in **Count 8**, with evasion of a liability by deception in violation of Section 2(1)(a) of the Theft Act of 1978 based on his false representation to Finch that the check he had provided for $35,546.57, drawn on Chevy Chase bank account, as repayment for the Porsche previously purchased was valid when, in reality, PARKER knew that the Chevy Chase bank account had been previously closed and the check would bounce.

      i)      **Counts 9 and 10** relate to PARKER's fraud against victim VS, the brother of the seller of a property purchased by PARKER in 2006.  According to testimony provided by the victim and his brother, PARKER told them that he was a wealthy businessman with restaurants in the US and UK.  PARKER attempted to purchase a property at Woodhall Lane in 2006.  PARKER told the seller that he had cash flow problems and asked for a loan of £5,000. The seller's brother, VS, loaned PARKER £4,000, which he repaid with a check from HSBC Bank on an account in the name of American Chili, which the brothers later found out had been dissolved two years prior. The deed of assignment for the property was later signed by both seller and PARKER. PARKER then asked to borrow an additional £10,000 to pay a broker to complete the real estate transaction. VS gave PARKER a further £9,000. The transaction did not progress, despite PARKER's representations that the money was on the way, and the brothers discovered that the solicitors working on behalf of PARKER had ceased to act. PARKER never repaid the money lent to him, nor the money he is legally bound to pay, having signed the deed of assignment. In November 2006, PARKER sent a text message to the seller gloating that he had stolen the £13,000 and spent it.  PARKER was ultimately convicted of two counts of dishonestly obtaining property from VS.

      j)      PARKER's fraudulent conduct, as outlined by victim testimony, is corroborated by bank records, vehicle registration records, corporate documents, as well as testimony from bank employees and other third-party witnesses.

7.      PARKER may be found within the jurisdiction of this court at the Elkton Federal Correctional Institution, 8730 Scroggs Road, Lisbon, OH 44432, where he is serving a sentence for fraud charges.  PARKER is scheduled for release on October 18, 2019.

8.      Jessica K. Weare, a former attorney in the Office of the Legal Adviser of the

5

United States Department of State, has provided the Department of Justice with a declaration authenticating a copy of the diplomatic note by which the request for extradition was made and a copy of the extradition treaty between the United States and the United Kingdom, stating that the offenses for which extradition is demanded are covered by the treaty, and confirming that the documents supporting the request for extradition are properly certified, so as to enable them to be received in evidence; and

9. The declaration from the Department of State with its attachments, including a copy of the diplomatic note from the United Kingdom, a copy of the relevant extradition treaty, and the certified documents submitted in support of the request, (marked collectively as Government's Exhibit #1) are filed with this complaint and incorporated by reference herein.

WHEREFORE, the undersigned requests that a warrant for the arrest of the aforementioned person be issued in accordance with the Extradition Treaty between the United States and the United Kingdom, and Title 18, United States Code, Section 3184, so the fugitive may be arrested and brought before this court, "to the end that the evidence of criminality may be heard and considered" and that this complaint and the warrant be placed under the seal of the court until such time as the warrant is executed.

Om M. Kakani (NY: 4337705)
Assistant United States Attorney

Sworn to before me and subscribed in my presence this 20th day of September, 2019, at 2:27 pm.

Thomas M. Parker, United States Magistrate Judge

6